

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. PD-0554-19

### OMAR HERNANDEZ, Appellant

### v.

### THE STATE OF TEXAS

### DISSENT TO REFUSAL TO GRANT
### APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE FOURTEENTH COURT OF APPEALS
### HARRIS COUNTY

**SLAUGHTER, J., filed a dissenting opinion.**

### DISSENTING OPINION

In a prosecution for tampering with a governmental record,[1] do all documents generated by government employees and stored on a government computer automatically meet the applicable statutory definition of "governmental record" under Penal Code Section 37.01(2)(A)? Or must the State instead put forth evidence specifically showing that such records are "belonging to, received by, or kept by government for information," as required by that statutory definition? I would grant the instant petition for discretionary review and hold that the answer to the first question is no, and

---

[1] *See* TEX. PENAL CODE § 37.10(a)(1).

the answer to the second question is yes. The statutory requirements may not be watered down simply because the defendant is a government employee working on a government computer.

The facts in this case show that Omar Hernandez, Appellant, a former constable's deputy, was convicted of state-jail felony tampering with a governmental record after he entered false information into an electronically-stored offense report. The report was marked "DRAFT" at the top of each page. At trial, the State failed to introduce evidence to establish that this document was a final document versus a draft. It further failed to prove the process by which this report was generated, the process for converting the "draft" report into a final report, or the informational purpose served by the draft report. By rejecting Appellant's sufficiency complaint, the court of appeals' decision appears to create a *per se* rule that all electronic documents created by government employees and stored on government computers constitute "governmental records" for purposes of the tampering statute, regardless of whether such documents are shown to be "belonging to, received by, or kept by [the] government for information." TEX. PENAL CODE § 37.01(2)(A). I disagree with this approach not only because it fails to strictly adhere to the statutory requirements for establishing that something is a governmental record, but also because upholding a state-jail felony conviction for what could be an unfinalized draft may be a very dangerous precedent to set. Accordingly, I respectfully dissent from the Court's refusal of Appellant's petition for discretionary review.

**Background**

Appellant served as a constable's deputy for Harris County Precinct 6. While on duty, he and his trainee, Deputy Viet Tran, were called to the scene of a hit-and-run traffic accident. The complainant gave Appellant and Tran the license plate number of the vehicle that had backed into her vehicle before fleeing. When entering his report of the incident into the constable's computer

system, Appellant indicated that he had used the license plate information to locate the suspected offender's address. He also represented that he had gone to the suspect's address to investigate, but was unable to locate the suspect or the suspect's vehicle at that address. A subsequent investigation by Internal Affairs revealed that the latter statements were false—Appellant had not actually visited the suspect's address. Based on Appellant's false assertion, he was ultimately charged with and convicted of tampering with a governmental record by entering false information in the offense report with the intent to defraud or harm another. *See* TEX. PENAL CODE § 37.10(a)(1), (c)(1).[2] Following his conviction, the trial court sentenced him to two years in state jail, probated for two years.

On direct appeal to the Fourteenth Court of Appeals, Appellant argued, among other things, that the evidence was insufficient to prove that the document at issue—the electronic offense report—was a governmental record at the time he made the false entry.[3] Appellant asserted that the

---

[2]    The indictment alleged as follows:

> OMAR HERNANDEZ, hereafter styled the Defendant, heretofore on or about MAY 4, 2015, did then and there unlawfully, knowingly make a false ENTRY IN a governmental record, namely, HARRIS COUNTY CONSTABLE OFFICE PRECINCT 6 OFFENSE REPORT NUMBER 15-67660, attached hereto as exhibit A. BY STATING THAT ON MAY 4, 2015 HE CONDUCTED AN INVESTIGATION AT 4855 W. FUQUA, APT. 2204 AND THE ACTIONS OF THE DEFENDANT WERE DONE WITH THE INTENT TO DEFRAUD AND HARM ANOTHER.

[3]    Specifically, Appellant argued that "in order to sustain a conviction under § 37.10(a)(1), the false statements must be made in a government record and a document is not a government record until it is filed with the government." Appellant's Brief to the Fourteenth Court of Appeals, No. 14-17-00643-CR, at 12. I recognize that the argument raised by Appellant in the court of appeals is not precisely the same as the issue I would urge this Court to address on discretionary review. However, in his petition for discretionary review, Appellant expressly asks this Court to decide "whether the court of appeals erred in holding that the record was a government record because it was created by a government employee on a government created form on a government computer." The question

offense report, "a draft document in electronic form on the criminal justice system database," did not meet the statutory definition of governmental record because there was no evidence "showing that the record had been filed or 'received by' the government" at the time that he entered false information. *See Hernandez v. State*, 577 S.W.3d 361, 367 (Tex. App.—Houston [14th Dist.] 2019).

In rejecting Appellant's sufficiency argument, the court of appeals determined there was enough evidence on the face of the offense report from which the jury could "discern identifying information showing that appellant created the report on the Constable's criminal justice database from which the printout came." *Id.* at 368. The court noted that the document "bore the indicia that appellant had written the report on the precinct's computer system, property which the jury reasonably could have inferred belonged to and was kept by appellant's government employer for information." *Id.* Thus, the court of appeals determined that this document was a governmental record solely because it was created on a law enforcement database by a government official. The court of appeals conducted no analysis of how or whether an electronic document marked "DRAFT" was "belonging to, received by, or kept by" the government "for information." *See* TEX. PENAL CODE § 37.01(2)(A).

### The evidence at trial failed to establish that the draft offense report was a "governmental record."

At trial, the State focused almost exclusively on proving the falsity of the information contained in the police report, that Appellant created the police report, and that Appellant's intent was to harm or defraud another. The State never sufficiently addressed whether any offense report

---

presented on discretionary review, therefore, is at what point does an electronic document generated by a government employee become a "governmental record" that may give rise to a conviction for tampering? Given the state of the record and the important policy considerations discussed below, I would grant review to address this question.

met the definition of "governmental record," much less how or why the document at issue could satisfy that definition. Remarkably, no one at trial even addressed the fact that the report, on each of its four pages, was labeled "DRAFT."

Rather than satisfying its burden to prove beyond a reasonable doubt that the document at issue was a governmental record, the State merely elicited conclusory testimony from witnesses to establish this requirement. For example, the State asked two witnesses, a former Harris County prosecutor and the former head of internal affairs for Precinct 6, whether "an offense report is a governmental record," to which both witnesses during their respective testimony replied "yes."[4] The State failed to have either witness explain how or why the police report was a governmental record under the definition provided to the jury. ("Governmental record" means "anything belonging to, received by, or kept by government for information, including a court record.") 1 CR 263; *see* TEX. PENAL CODE § 37.01(2)(A).

As part of its burden to prove that the "draft" police report was a governmental record, the State needed to prove that the document belonged to, was received by, or was kept by the government "for information." Yet the testimony at trial did not prove this. While there was some minimal testimony regarding the importance of truthfulness and integrity when writing an offense report,[5] no testimony adequately explained the purpose of such a report generally (i.e. that a police

---

[4]    4 RR 64; 4 RR 80.

[5]    For example, witness Victor Garza, a former captain in Precinct 6, testified that the reports must be truthful "to ensure that the citizen who is needing that police service receives that police service." 4 RR 80. Sergeant Fabian Arista similarly testified that officers are trained to be truthful in their offense reports because such reports are important "for the services that police departments provide to the citizens of any police agency." 4 RR 39. It is arguable that such testimony may allow the jury to draw a reasonable inference, based on its common-sense knowledge of what police officers generally do (e.g., protect the community and help solve crimes), and what type of

report is needed to provide accurate information to document or investigate a criminal incident), let alone whether a draft report would be used for such purposes.

The offense report contains an entry indicating that the report was approved by an "approving officer" four days after its creation, but there was no testimony as to who the "approving officer" was, the process by which the report was "approv[ed]," or the meaning of "approv[ed]."[6]  Without more, these entries referring to an approving officer do not resolve the uncertainty stemming from the presence of the word "DRAFT" on each page.  The State needed to explain how or why the government would use or rely on a document "for information" that, without evidence to the contrary, appears to be preliminary and incomplete.  Yet, the testimony wholly failed to address this

---

information an offense report contains (e.g., description of offenses) that offense reports help officers in providing services to the community and solving crimes. But ultimately, I believe this testimony was too generic and lacking in detail to constitute sufficient proof beyond a reasonable doubt that the purpose of a police report is to provide information to the government. Moreover, even accepting that this testimony would allow the jury to draw a reasonable inference about offense reports generally, this testimony did not address how the specific "draft" document at issue was "belonging to, received by, or kept by" the government for information.  Accordingly, this evidence is inadequate to sustain the State's burden of proof.

[6]     The offense report contained the following information:

| Field | Entry |
|---|---|
| Supplement No. | Orig. |
| Report Date | 05/04/2015 |
| Reported Time | 18:22 |
| From Date | 05/04/2015 |
| From Time | 18:22 |
| To Date | 05/04/2015 |
| To Time | 19:00 |
| Operator | C60357/Hernandez, Oma |
| Entered by | C60357 |
| Report Officer | C60357/Hernandez, Oma |
| 2nd Operator | Tran, Viet |
| Approving Officer | C60284 |
| Approval Date | 05/10/2015 |
| Printed at | 06/05/2015 |

matter. There was no real explanation of: (1) the process by which an offense report is made and stored; (2) how the computer system at the constable's office works for creating offense reports; (3) how or if a police report goes from a draft to a final version; (4) whether a police report is reviewed by a supervisor for accuracy (other than through the internal affairs investigation); or (5) whether the constable's office ever relies on draft police reports "for information" in conducting its investigations.

The court of appeals pointed to Deputy Tran's testimony as supporting the reasonable inference that Appellant had authored the report on the precinct's computer system, which was property that "belonged to and was kept by appellant's government employer for information." *Hernandez*, 577 S.W.3d at 368. However, Deputy Tran's testimony on this topic was too vague and confusing to serve as an adequate basis for proving that the report at issue was a governmental record:

Q.  Deputy Tran, how do you know the defendant wrote this?

A.  Because I asked him, because the owner approved the report.

Q.  Owner approved the report. What does that mean?

A.  Means whenever he complete the report, he submit it, owner approve.

Q.  And, also, in State's Exhibit 1, I guess if you're writing the report, do you have a specific log-in that you use to show that you're the one that's on the computer writing the report?

A.  Yes, ma'am.

Q.  Okay. And in this particular case, did the defendant's log-in show up with his name that he was writing the report?

A.  Yes, ma'am.

Q.  And when you say owner approved, is that what you mean; or is that something in addition to that?

A.  Yes, ma'am. That's when whoever completed the report, he approved and showed on the report that—whoever approved the report.

3 RR 52-53.

Although this testimony supports the conclusion that Appellant wrote the draft report, it does not explain if or when the report ever became a final version, if a supervising officer had to approve it, the approval process, or if it was a document that the constable's office would rely on "for information." It creates many more questions than it answers. Who is the "owner?" What does it mean to "approve[] the report," and does such "approval" impact the usefulness of the report? Who approves the report? Is a report final once it is approved? What does it mean to "submit" the report and what impact does that have?

State's witness Fabian Arista, a former sergeant in the Precinct 6 internal affairs division, did not do much to clarify these questions; instead, his testimony created more confusion. When asked how his investigation of this incident began, he indicated that he first "pulled the offense report, got the unit history of the person who authored the report and spoke to Deputy Tran as the witness." 4 RR 26. When asked to discuss the information that could be gleaned from the face of the offense report, Arista indicated that he could discern this was an "original" offense report, as opposed to a supplement. The prosecutor asked him to explain the system for creating a supplemental report as follows:

> Q. Okay. If an investigation spans multiple days, how does the offense reporting system allow for deputies to report what they've done at different times?
>
> A. Deputies can reenter that offense report and add what we call a supplemental report, which would read S-U-P instead of O-R-I-G, the supplemental and the date and time of the stamp at the bottom showing the deputy supplemented the report after a different date than the original was made.
>
> . . .
>
> Q. Okay. So, if a deputy were to write something like in this report, the language

> that we've been talking about . . . and they actually—they wrote it but they intended to do [the investigation] on a different day, what's the—what would be the normal way of reporting that?
>
> A.     Normally, when the deputy takes actions, they would go ahead and go back to the report and supplement their report, saying, I took this action on this particular day.

4 RR 39-41.

Arista then confirmed that he interviewed Appellant approximately one month after the original offense report was prepared and that there had been no supplemental report in this case. Aside from these statements, Arista never addressed the questions raised by Deputy Tran's testimony. He also never addressed the label of "DRAFT" on every page of the report. He merely called it an "original" report and explained how supplements could be created. Nothing in his testimony clarified the meaning of "owner," "approve," or "submit," or when (or even if) the report becomes a document that the constable's office relies on "for information." Thus, none of the testimony, individually or collectively, is sufficient to prove that the police report at issue was a "governmental record" within the meaning of Penal Code Section 37.01(2)(A).

**Rules of statutory interpretation and public policy considerations require a finding that this "draft" document was not a governmental record for purposes of the tampering statute.**

The evidence presented in this case never addressed whether the offense report marked "DRAFT" was a preliminary document subject to further review and changes or rather was a final document that would be relied upon for official informational purposes. All that we really know about this document based on the state of the record is that Appellant entered the information into his government computer, he "submitted" or "approved" the information, and the information was later available to be printed out as a "draft" report. Appellant's conduct in entering information into

a government database and hitting 'save' is the kind of action engaged in thousands, or perhaps tens of thousands, of times per day by government employees across the state. I disagree with the court of appeals' suggestion that all such actions necessarily result in the creation of a governmental record that may be tampered with, regardless of the type of document or information at issue. By creating a *per se* rule that every document saved to a government computer system constitutes a governmental record, the court of appeals' approach glosses over the statutory requirement that such documents must be shown to be "belonging to, received by, or kept by government for information" before an actor may be subjected to criminal liability for tampering. TEX. PENAL CODE § 37.01(2)(A). Further, such an approach potentially subjects thousands of government employees to prosecution for trivial errors in documents that may be unfinalized drafts. Having such precedent is fraught with peril.

First, generally speaking, a "draft" is subject to change and correction. The dictionary defines "draft" as "a preliminary sketch, outline, or version."[7] As preliminary versions, drafts often contain typos and wrong information or may be misleading because they are missing information. People almost always edit their drafts for accuracy so that when they issue a final version, the information is correct. Further, drafts may often be reviewed by supervisors for input and corrections. Thus, it would seem that a governmental agency would not typically rely on a draft document "for information," but instead would rely on the final version "for information." Subjecting someone to criminal prosecution for a document that is not yet final and is subject to correction or revision could not possibly be what the Legislature intended with the statute.

Second, the *mens rea* for Class A misdemeanor tampering with a governmental record by entering false information, which subjects someone to up to a year in jail, is knowingly. *See* TEX.

---

[7]    WEBSTER'S NEW COLLEGIATE DICTIONARY 380 (9th ed. 1988).

PENAL CODE § 37.10(a)(1), (c)(1). A *mens rea* of knowingly could be proved by something as simple as a witness testifying, "I told the defendant x, y, and z, but she put in the report that it was a, b, and c." Human beings make mistakes. A person could be mistaken about what they heard or might confuse situations with one another and include the wrong information. Under the court of appeals' approach, someone may be subjected to criminal liability for making "knowing" mistakes. But imposing criminal liability against government employees for such mistakes is inconsistent with the statutory requirements.

Third, the precedent set by the court of appeals' opinion fails to account for the realities of day-to-day life in the digital age. In a world where government employees complete the great bulk of their work on computers that automatically save documents to government databases, is every such action to be viewed as generating a new governmental record that can be tampered with? Or must the State make some greater showing with respect to the informational purpose served by the document before a government employee may be subjected to criminal liability for tampering? Surely not every email, memo, report, etc., generated by a government employee constitutes a governmental record that is kept by the government for information. To hold otherwise would broadly permit criminal sanctions against government employees, even for *de minimis* falsifications on documents that are lacking in any official purpose. I can also see this being abused for selective or political prosecutions. Such an approach conflicts with both the statutory language and the Legislature's apparent intent to limit criminal liability to falsifications of documents that are kept for official informational purposes.

**Conclusion**

While I can conceive of instances in which the type of document at issue here would

constitute a governmental record, the facts in this record fail to adequately establish the informational purpose served by this draft offense report. Thus, I would hold that the State failed to meet its burden of proving that the document at issue was a governmental record. Moreover, by allowing this court of appeals precedent to stand, we are potentially subjecting tens of thousands of government employees to criminal liability for making simple mistakes at work regardless of the importance of the mistaken information, without the benefit of time for correction, and regardless of how preliminary the document may be. I would grant review in this case to clarify that not every document generated by a government employee on his government computer automatically constitutes a governmental record for purposes of the tampering statute. Rather, the State is bound to put forth sufficient evidence to show that the document at issue is "belonging to, received by, or kept by" the government for some official informational purpose before it may constitute the type of document that would subject an actor to criminal liability for tampering. Because the Court declines to address these issues and refuses review, I respectfully dissent.

Filed: November 20, 2019
Publish